IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Action No. |
| | ) | 1:24-CR-257-JPB-JSA |
| *v.* | ) | |
| | ) | |
| DWAYNE PETERSON DAVIS | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Pete Davis, through counsel, respectfully submits this Sentencing Memorandum to assist the Court in fashioning an appropriate sentence, in support of his objections to the application of the U.S. Sentencing Guidelines as calculated by the Probation Office and Government, and in support of his request for a variance below the final calculated Guidelines range.[1]

I.    **MR. DAVIS'S PERSONAL HISTORY AND THE CIRCUMSTANCES OF THE OFFENSE WARRANT A VARIANCE AND SUPPORT HIS OBJECTIONS TO THE APPLICATION OF THE GUIDELINES.**

A.    **Mr. Davis's Personal History.**

Mr. Davis is a 55-year-old husband and father of twins who start college this month.  He was born and grew up in rural Mississippi. After his parents divorced when he was 9 or so years old, Mr. Davis lived with his mother following the divorce and was raised by her thereafter. In fact, Mr. Davis did not see his father again until running into him the summer that he graduated high school. Upon

---

[1] The Final Presentence Report has not yet been distributed.

speaking to his father for the first time in years, Mr. Davis learned that his father had lived in the same small town all along.

Mr. Davis has worked since his parents divorced. He began working as soon as he could in his mother's country store, which she ran to support him and his four siblings. After a hurricane swept through the area and destroyed the store, it was forced to close. Several years later, in junior high school, Mr. Davis began working at a local shoe store after school and on the weekends, a job he held until he graduated from high school. Mr. Davis has been working ever since.

In one of the most pivotal moments of his life, Mr. Davis found his faith, which sustains him yet today, when he began regularly attending church in junior high school. Mr. Davis found direction, purpose, and support in the church, participating in the church's youth center and as many volunteer activities as he could.

Although he eventually became the first in his family to graduate from college, after graduating from high school Mr. Davis joined the National Guard with the encouragement of his youth minister. Mr. Davis returned home after serving on active duty for almost two years, uncertain about what he would do next. The church again provided Mr. Davis a life changing moment – his pastor awarded Mr. Davis a full scholarship to The University of Mississippi ("Ole Miss"). Mr. Davis visited the college for the first time two days later, and two days

after that, began classes at Ole Miss. Working while he was in school, including as an Assistant to the Chancellor of the University, Mr. Davis graduated in 1994 with a B.A., and later went on to get a master's degree in education from Ole Miss in 1996.

Mr. Davis began his career in banking, focusing on specialty financing while living in Montgomery, Alabama. Mr. Davis eventually became a Managing Director at Credit Suisse, working in New York City and living in Atlanta, Georgia. In 2008, at the age of 39, Mr. Davis left the corporate life behind, founding Peachtree Investment Solutions, Inc. ("PIS"). Mr. Davis went on to start several other companies, including a South Carolina-based recycling company and a South Carolina-based freight company.

While working at Ole Miss, Mr. Davis met and subsequently married his wife in 1996. Mr. Davis and his wife live in Atlanta, Georgia, where they raised their two children. Their twins start college at Clemson University and Auburn University this month.  They are active in their Atlanta church, where Mr. Davis serves in several capacities, most prominently as an Usher. Both Mr. Davis and his wife have also been extremely involved in volunteer efforts through their children's school over the past 13 years. Mr. Davis is also active in charity activities, most notably the Invitational Sports Foundation, a Graniteville, South Carolina-based charitable organization that he founded to grow youth sports

participation, with a focus on golf. Through the Foundation, Mr. Davis annually

organizes the Sage Valley Junior Invitational Tournament, the number one junior

golf event in the United States and played in Graniteville, South Carolina.[2] This

Foundation and Tournament have raised several million dollars for charity since

their inception over 15 years ago.

### B.    The Relationship Between Mr. Davis and GEICO.

In 2010 or so, after founding PIS, Mr. Davis met an Assistant Controller for

GEICO who was responsible for tax and other issues at GEICO. Soon thereafter,

GEICO began investing with Mr. Davis and PIS in various tax advantaged

investments, including land conservation easements, opportunity zone investments,

and film and entertainment tax credit investments.

Since then and continuing even to the present day, GEICO and Mr. Davis

have been and are partners together in multiple partnerships formed for the sole

purpose of generating substantial tax benefits in excess of $200 million for GEICO

from investments in various tax advantaged transactions. GEICO's role in these

partnerships was to contribute tens of millions of dollars to generate tax benefits

for itself that far exceeded the capital it contributed. In return for fees and a share

of the upside, Mr. Davis managed the operation of the partnerships, which

---

[2]*See* https://en.wikipedia.org/wiki/Junior_Invitational;  https://juniorinvitational.com/

included, among other things, managing the underlying real estate developments and paying the partnership's bills (such as property taxes).

Even though it reaped substantial tax benefits from its relationship with him, in 2019, GEICO began failing to live up to its partnership obligations to Mr. Davis and PIS, most significantly its obligations to fund the operations of these partnerships. As a result, PIS was forced to advance funds to partnerships for the payment of taxes and other operating costs.  Ultimately, GEICO's failure to live up to its partnership obligations caused Mr. Davis and PIS tens of millions of dollars in damage.  For example, GEICO's failure to fund certain rent payments called for in two partnerships led to the filing by lenders of two deficiency lawsuits in 2021 that resulted in personal judgments against Mr. Davis (and others) totaling over $3.6 million.

Mr. Davis's and GEICO's dispute over these partnerships is ongoing even now. On December 31, 2024, a lawyer for five open partnerships involving GEICO and PIS sent GEICO five demand letters detailing the damages that GEICO has caused by its failure to live up to its financial obligations in those partnerships (these letters include the deficiency judgments referenced above). One of these demand letters is included as an example with Mr. Davis's response to the Initial Presentence Report.

**C.    Background on Offense Conduct and PIS QOZ Fund 2018-A, LP**.

The PIS QOZ Fund 2018-A, LP partnership (the "2018-A Partnership") was the last one between GEICO and Mr. Davis.  The 2018-A Partnership was formed to invest in and develop Qualified Opportunity Zone properties in North Augusta, South Carolina, that would result in tax credits flowing through to GECIO, the partnership's 99% member. GEICO contributed a total of $26 million in initial capital to the 2018-A Partnership.  The underlying real estate development involved several improvements (i.e., office building, hotel, parking garage) in the area surrounding the minor league baseball stadium in North Augusta.

In 2019, an additional capital contribution was required to achieve the partnership's objectives and obtain GEICO's desired tax benefits.  After first agreeing to make this contribution, GEICO reneged and informed Mr. Davis in a December 31, 2019, email that it would not contribute any more money to the 2018-A Partnership. GEICO also demanded that Mr. Davis find a buyer for GEICO's interest.

At the same time, Mr. Davis and GEICO were dealing with a contentious, multi-party dispute involving the construction of a parking deck as part of the North Augusta development. In 2019, without approval, the developer of the properties in North Augusta built the planned parking deck out of order under the development plan.  This caused a sequence of cascading events that by 2020

6

resulted in multiple pending civil lawsuits involving the 2018-A Partnership, the developer, the construction firm, and two banks that had provided funding for the development. These lawsuits quickly became contentious, which along with the number of parties involved, made it difficult to reach a resolution satisfactory to all parties.

The parties ultimately reached a tentative resolution of these civil lawsuits in April 2021. In late April, as the limited partner of the 2018-A Partnership, GEICO contributed approximately $5.9 million to the 2018-A Partnership to resolve these civil lawsuits and pay pending tax bills for the underlying real estate development. After the partnership's lawyer informed GEICO that his firm would not hold the funds in its escrow account, the funds were sent to the 2018-A Partnership's UBS account.  Indicative of the contentious nature of the various disputes and competing interests, the tentative settlement did not happen and would not happen for several more months as negotiations continued.

Mr. Davis used approximately $2.3 millions of the funds contributed to the partnership for legitimate, intended purposes: just over $2 million paid for taxes and approximately $231,000 for the settlement with the developer.  Later in the year, at GEICO's request, Mr. Davis also paid approximately $288,00 to satisfy when due the invoice from the law firm representing the 2018-A Partnership. Thus,

in total, Mr. Davis ultimately used or expended over $2.5 million for legitimate partnership purposes.

But beginning on April 29, 2021, and through July of 2021, Mr. Davis misappropriated approximately $3.6 million of the funds for his own personal and business purposes. During this period, Mr. Davis lied about and attempted to conceal from GEICO what he had done with the money. Mr. Davis has plead guilty for that conduct and fully accepts responsibility.

## II.    GUIDELINES OBJECTIONS.[3]

### A.    Gross Receipts Enhancement.

Mr. Davis objects to the application of the two-level enhancement that applies "[i]f the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." *See* U.S.S.G. § 2B1.1(b) (17)(A) (the "Gross Receipts Enhancement"). The term "financial institution" includes an insurance company. U.S.S.G. § 2B1.1, comment. (n.1).

The Eleventh Circuit has held that for the Gross Receipts Enhancement to apply, the financial institution "must be the source of the property, which we interpret as having property rights in the property." *United States v. Muho*, 978 F.3d 1212, 1221 (11th Cir. 2020). "A financial institution is a source of a defendant's

---

[3] Mr. Davis withdraws his objection to the calculation of loss in the Initial Presentence Report and agrees with the Government's calculation of loss as set forth in its objection.

gross receipts if it owns the funds." *United States v. Stinson*, 734 F.3d 180, 186 (3d Cir. 2013). The language "derived . . . from" in the enhancement "calls for identification of the *specific* source of the property." *Muho*, 978 F.3d at 1222 (emphasis in original). As the Eleventh Circuit explained, "'[s]ource' means that the financial institution, before the offense conduct, possesses and controls the property to be filched: the 'from' in 'derived from.' In shorthand, the financial institution 'holds' the property." *Id.*

Here, the 2018-A Partnership held and was the source of the funds filched. As the limited partner responsible for capitalizing the partnership, GEICO contributed and sent funds to the 2018-A Partnership, specifically to its UBS account held by and belonging to the partnership. This was done for the entirely non-fraudulent and legitimate purposes of paying partnership taxes and settling the civil lawsuits. About that, there is no dispute among the parties. At that point, the 2018-A Partnership, which is not a financial institution, owned the funds and GEICO's property interest and control over the funds had ended.

The Court should find that the source of the funds filched here is the 2018-A Partnership. "[A] financial institution is a source of the gross receipts when it exercises dominion and control over the funds and has unrestrained discretion to alienate the funds." *Stinson*, 734 F.3d at 186. GEICO's dominion and control over the funds ended when they were deposited into the Partnership's account.

9

Pursuant to a negotiated plea agreement, Mr. Davis plead guilty to Count

Three, which charges the first fraudulent movement of funds out of the 2018-A

Partnership's UBS account to a PIS account (Count One charged GEICO's transfer

to the 2018-A Partnership's UBS account; Count Two charged the movement of

funds that went to pay property taxes). Subsequent fraudulent transfers of the

misappropriated money were then made either out of the Partnership's UBS

account or PIS's accounts. GEICO is the victim here and due restitution because it

is the limited partner in the 2018-A Partnership responsible for funding the

partnership. But the funds that were obtained by fraud in this case are funds that

belonged to the 2018-Partnership when they were filched.[4]  The 2018-A

Partnership "owned" and held the property rights in the funds, which were in its

UBS account, when they were fraudulently transferred.  As the limited partner,

GEICO ended up bearing the loss and is due restitution only because it ultimately

had to make another contribution to the 2018-A Partnership to settle the civil

lawsuits.

---

[4] The application note that gross receipts include all funds "obtained directly or indirectly as a result of" the offense should not change this result. *See* U.S.S.G. § 2B1.1 comment. (n. 13(b)). GEICO contributed $5.9 million to the 2018-A Partnership for the payment of its taxes and to settle the civil lawsuits which were legitimate, non-fraudulent obligations of the partnership.  The Court should find that cuts off GEICO's ownership of, or property rights in, the funds sent to the 2018-A Partnership account and that as a result, Mr. Davis did not directly or indirectly obtain funds from a financial institution, i.e., GEICO as a result of the offense.

Moreover, for purposes of applying the Gross Receipts Enhancement, GEICO was not functioning as an insurance company, i.e., a financial institution. Rather, GEICO was investing in a real estate development partnership formed to generate significant tax deductions for it. As GEICO's CFO told the FBI, Berkshire Hathaway called the shots on GEICO's tax investment decisions, including the ones relevant to this case. No party contends, and nor could they, that Berkshire Hathaway meets any of the definitions of a financial institution. Counsel cannot find a case applying the Gross Receipts Enhancement in these circumstances, where a financial institution contributed funds to another business that is clearly not a financial institution for legitimate, non-fraudulent purposes, that were then misappropriated. This Court should not apply the enhancement here for the reasons set forth here.

**B.    Enhancement for Abuse of a Position of Trust.**

Mr. Davis objects to the application of the two-level enhancement that applies where a defendant abuses a position of trust "in a manner that *significantly facilitated* the commission or concealment of the offense." U.S.S.G. § 3B1.3 (emphasis added). "Because all fraud cases involve some amount of misplaced trust, for this enhancement to apply, 'there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario.'" *United States v. Smith*,

853 F. App'x 589, 594 (11th Cir. 2021) (quoting *United States v. Ghertler*, 605 F.3d

1256, 1264 (11th Cir. 2010)). Whether the abuse-of-trust enhancement is

appropriate is "highly dependent on the specific facts in each situation." *United*

*States v. Morris*, 286 F.3d 1291, 1296-97 (11th Cir. 2002).

While Mr. Davis occupied a position of trust with respect to GEICO by

virtue of his role with the 2018-A Partnership and his long relationship with

GEICO in other partnerships, that position of trust "did not significantly facilitate

the commission or concealment of the offense" as required by § 3B1.1. Reduced

to its essence, this case presents a garden-variety fraud – Mr. Davis

misappropriated the funds for his own purposes and lied about that. Mr. Davis's

role did not significantly facilitate that – anyone working with GEICO to resolve

the partnership's issues could have accomplished the fraud here. To be sure,

GEICO relied on Mr. Davis's "integrity and honesty," but the record does not

support a finding that such reliance went beyond what is inherent in every fraud

scenario. *See*, *e.g.*, *Ghertler*, 605 F.3d at 1264.

Moreover, GEICO has not removed or attempted to remove Mr. Davis from

his role as the managing partner in several other open partnerships, belying the

conclusion that GEICO believes Mr. Davis abused his position of trust to

significantly facilitate his offense (notwithstanding their victim impact statement

here).[5] Consistent with his guilty plea and acceptance of responsibility, Mr. Davis defrauded GEICO.  But the record does not support a finding that he "took advantage" of his role with the Partnership in a way that significantly facilitated that.  *See United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008) (holding that the enhancement applies only where "the defendant takes advantage of the relationship to perpetrate or conceal the offense.") (quotations omitted).

## III.  APPLYING SECTION 3553 TO THE FACTS AND CIRCUMSTANCES OF THIS CASE WEIGHS IN FAVOR OF A SENTENCE BELOW THE FINAL GUIDELINES RANGE.

This Court is well versed in the factors to be considered in imposing a sentence that is "sufficient, but not greater than necessary to comply with" the purposes listed in § 3553(a)(2). 18 U.S.C. § 3553.  At sentencing, Mr. Davis will request a variance below the advisory Guidelines range based on the factors and purposes set forth in § 3553(a).  In addition to the Guidelines, those factors include:

- Mr. Davis's personal history and characteristics;

- The nature and circumstances of his offense;

---

[5] Earlier this year, GEICO attempted to remove Mr. Davis from one open partnership that is currently in the process of settling an open IRS audit. Given that Mr. Davis has refused to participate in that settlement for various reasons, and coming after a December 31, 2024, demand letter regarding this partnership, this attempted removal appears to be calculated to advance GEICO's interests in those matters, more than for any other purpose.

13

- The need for the sentence imposed to reflect the seriousness of Mr. Davis's offense, promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; and

- The need to provide restitution to the victim.

§ 3553(a)(1), (a)(2), and (a)(7).

While the Guidelines range is one factor, the Court must consider these additional statutory factors and should conclude that the Guidelines result in a sentencing range that is excessive in this case, i.e., unreasonable, and vary downward. *See Gall v. United States*, 552 U.S. 38, 47 (2007) (rejecting any requirement of "extraordinary circumstances" for a downward variance); *Kimbrough v. United States*, 552 U.S. 85 (2007) (holding that the court shall impose a sentence that varies downward from an excessive Guidelines range).

**A.    Mr. Davis's Personal History and Characteristics Support A Below Guidelines Sentence.**

The conduct involved in this case does not reflect Mr. Davis's full character and overall life of good conduct and good works. Mr. Davis is a husband, a father, a man of faith, a hard worker, and someone who has given back to the community. Counsel for Mr. Davis is in the process of collecting and will supplement this

Sentencing Memorandum with letters from people that Mr. Davis has touched in his life and to whom he has demonstrated his good character and qualities.

But for the conduct in this case, Mr. Davis has lived a life consistent with the tenets of his Christian faith. Mr. Davis has no criminal history and as reflected in the PSR, qualifies for the application of the Guideline for Zero Point Offenders. *See* U.S.S.G § 4C1.1. Since junior high school, Mr. Davis has participated in and been active in the life of his church. When he returned from serving in the military, recognizing both his exemplary personal qualities and his potential, Mr. Davis's church awarded him a full scholarship to Ole Miss, which he had never even visited, despite growing up in Mississippi. After college, Mr. Davis met his wife, and with her, was an active member of their church, first in Alabama and then in Atlanta. Mr. Davis regularly serves as an Usher at his church in Atlanta and participates in the life of the church and his fellow congregants. For example, Mr. Davis and his wife mentor and assist a member of the Clergy at his church and his wife who are both immigrants to the United States. They have just started a family and have become close to Mr. and Mrs. Davis over the past several years.

Mr. Davis is a hard worker who built a career and several companies. He began working as a young boy and after completing his education, focused on building his career and supporting his family. Mr. Davis was raised by a single, hard working mother in modest circumstances in rural Mississippi. He began

working with her in their country store, and after that was destroyed by a hurricane, at a local shoe store.  Mr. Davis worked in high school and worked while he was in college. After a career in corporate banking that ended as a Managing Director at Credit Suisse, Mr. Davis founded PIS. Mr. Davis possessed sufficient expertise, skills, and reputation in his profession to attract and conduct business for years with GEICO, a Fortune 500 company.  Their partnership produced numerous productive deals and resulted in successful underlying real estate developments.  At the same time, Mr. Davis also founded other businesses in South Carolina, including an appliance recycling business in South Carolina that used groundbreaking technology to de-manufacture and recycle appliances. In its heyday, this company had over 200 employees and locations in several states.

Mr. Davis's history is also notable for his service to others.  After high school, with the encouragement of his youth minister, he joined the National Guard, serving almost two years on active duty and then approximately five years in the reserves.  Mr. Davis also serves his community by participating in charity activities, both big and small.  Mr. Davis's most notable community contribution is the Invitational Sports Foundation, a Graniteville, South Carolina-based charitable organization that Mr. Davis founded to grow youth sports participation, with a focus on golf. Through the Foundation, Mr. Davis annually organizes and hosts the Sage Valley Junior Invitational Tournament, played annually in Graniteville, South

Carolina. The Tournament is the number one junior golf event in the United States, among the leading junior tournaments in the world, and has been described as the "Masters of Golf."[6] This tournament has raised several million dollars for charity since its inception approximately 15 years ago. In addition, before their graduation earlier this year, Mr. Davis also could be regularly found volunteering at his children's school, manning concession stands, chaperoning trips (including to the Dominican Republic this past spring while on supervised release with the permission of the Court), and helping with other parent-related activities.

   With capital contributed by GEICO for several other tax advantage investments with PIS, Mr. Davis has also been instrumental in refurbishing Hickman Hall and Hickman Warehouse in Graniteville, South Carolina (refurbishing those buildings generated tax credits for GEICO). These historic buildings sit on the old Graniteville Company mill site.  The local community was devasted by the collision of two trains in 2005, one of which was carrying toxic chlorine gas (this disaster was reported nationally as occurring in Aiken County). The redevelopment of these historic buildings is a significant part of the Graniteville community's recovery from that disaster.

---

[6] *See* https://juniorinvitational.com; https://en.wikipedia.org/wiki/Junior_Invitational

**B.** **The Nature and Circumstances of Mr. Davis's Offense Support A Below Guidelines Sentence.**

Mr. Davis's offense is notable both for what it is and what it is not. Mr. Davis's offense is a relatively straightforward, garden variety fraud that took place over four months. Despite the detail alleged in the Indictment, the length of the PSR, and the ink spilled in Counsel's response to the PSR, this case involves a straight-forward fraud that involved the theft of $3.6 million from one victim and that lasted only four months, May through August 2021.  Simply put, Mr. Davis wrongfully took money for his own personal purposes and lied to GEICO to conceal that. Mr. Davis's sentence for that should be well below the advisory Guidelines range, which is excessive when considered against this conduct.

Mr. Davis did not devise or execute a fraud scheme that in any way involved misrepresentations about GEICO's investment in the 2018-A Partnership or the underlying real estate development.  About that there is no dispute – the 2018-A Partnership led to and resulted in a mixed-use development, referred to as Riverside Village, around the minor league baseball stadium, SRP Park, in North Augusta.  *See* https://getgreenstone.com/portfolio/riverside-village.  Nor did Mr. Davis devise or execute a fraud scheme that involved misrepresentations about the disputes that arose in 2019 related to the construction of the parking deck, the

multiple lawsuits that spawned, or efforts to bring those lawsuits to a global resolution. About that there is no dispute either.

This is not a fraud that involved misrepresentations intended to get members of the public or even existing clients to part with money that they would not otherwise part with, the loss of which is devastating to the victims. GEICO was obligated to the Partnership, by virtue of its role as limited partner, to contribute the money to pay taxes and end the litigation. That would have happened eventually if any of those things were to happen. While GEICO bears a loss from Mr. Davis's conduct, Mr. Davis is less culpable than defendants in the typical investment fraud schemes directed at the public that come before the Court.

The Court should also consider that, despite the allegations in the Indictment, Mr. Davis did not misappropriate all the funds that GEICO contributed to the partnership in late April 2021. He used approximately $2.3 million of the funds contributed to the partnership for legitimate, intended purposes: just over $2 million paid for taxes and approximately $231,000 for the settlement with the developer. Although GEICO referred the matter to the Department of Justice in late August, Mr. Davis did not know that. When GEICO asked him later that year to pay the invoice from the law firm that had represented the 2018-A Partnership, Mr. Davis did so, paying an additional $288,000 for the benefit of the partnership.

Mr. Davis's wrongful conduct over four months in the spring and summer of 2021 must be weighed against his history of good character and good qualities. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd*, 301 Fed. App'x 93 (2d Cir. 2008) ("[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing."). The balance in this case tips toward leniency and a below Guidelines sentence.

## C. The Remaining Sentencing Factors Support A Below Guidelines Sentence.

Mr. Davis is a 55-year-old white collar professional who spent his adult life building a career in the investment industry. Mr. Davis has never been to prison or even been in trouble with the law before. His career is now over, and Mr. Davis is forever tainted by his fraud conviction in this this case. Mr. Davis will never again be able to work in the investment industry; he will always be labeled as a convicted fraudster. Mr. Davis, who strayed from his faith with respect to his conduct in this case, has suffered shame in his community and in his church. Any sentence of imprisonment, that takes him away from his family and friends, is a serious sentence for a person in Mr. Davis's circumstances.

The professional and personal wreckage that accompanies a fraud conviction for someone like Mr. Davis contributes to the deterrent effect of being caught and

sent to prison for even a short period.  In this case, a Guidelines sentence is not necessary to promote respect for the law, or to deter others from committing fraud.

A sentence below the Guidelines will reflect the seriousness of the offense and be a just punishment.  Without minimizing conduct for which Mr. Davis accepts responsibility, Mr. Davis is a first time, non-violent offender who committed a white-collar fraud offense that involved an amount of money that was relatively insignificant to the victim, one of America's largest companies. *See United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008) (a sentence should "reflect the gravity of the defendant's conduct" without being "unreasonably harsh under all the circumstances of the case.") (quoting S.Rep. No. 98–225, at 75–76, 1984 U.S.C.C.A.N. at 3258–59).

Section 3553(a)(4) requires the Court to consider the need to protect the public. Mr. Davis's history and circumstances show that he is not a recidivist risk. In addition, his faith provides the basis to grow from this experience.  He has been and will be encouraged to repent, that is to engage in a sincere turn away from wrongdoing; his faith provides a source of morals and values that will guide him as he reenters society after serving his sentence in this case.

Finally, § 3553(a)(7) directs the Court to consider the need to provide restitution to any victims of the offense. Mr. Davis is in the process of winding up several businesses and attempting to recover as much value as possible from those

businesses and for his co-owners and investors. Mr. Davis has agreed to pay

GEICO approximately $3.3 million in restitution.  A modest prison sentence,

below the Guidelines, will facilitate his efforts to recover as much value as possible

and satisfy his restitution obligation.

## CONCLUSION

For the foregoing reasons, this Court should impose a reasonable sentence

that is well below the advisory Guidelines range.

Respectfully submitted this 5th day of August 2025.

_____
Douglas W. Gilfillan
Georgia Bar No. 294713

Gilfillan Law LLC
One Atlantic Center
1201 West Peachtree Street, Suite 2300
Atlanta, Georgia 30309
Phone: (404) 795-5016
Email: doug@gilfillanlawllc.com

*Counsel for Dwayne Peterson Davis*

## LOCAL RULE 7.1D CERTIFICATE

The undersigned hereby certifies that the foregoing has been formatted in Times New Roman font, 14 point type, which complies with the font size and point requirements of Local Rule 5.1C.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves notification of such filing to all counsel of record.

This 5th day of August, 2025.

*/s/ Douglas W. Gilfillan*
Douglas W. Gilfillan