IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action No. |
| v. | ) | 1:24-CR-257-JPB-JSA |
| | ) | |
| DWAYNE PETERSON DAVIS | ) | |

## MOTION FOR EXTENSION OF TIME
## TO VOLUNTARILY SURRENDER

**EXHIBIT B**





**HEADS OF TERMS**
**(SUBJECT TO CONTRACT)**

Date: 13 Marc 2026

**1. Parties**
Davis: Pete Davis ("Davis")

**2. Purpose and Integrated Vision**

The Parties acknowledge that this transaction is not solely a conventional land sale or development arrangement, but the formation of a long-term collaboration intended to merge complementary visions for restoration, conservation, and thoughtful place-based development.

Davis has, over many years, undertaken substantial restoration and conservation initiatives across the broader landholding, including the contribution of approximately 8,000 acres to protected conservation lands, reforestation efforts, adaptive reuse of historic buildings, and ecological rehabilitation of surrounding landscapes.

operates under a regenerative digital infrastructure model that integrates hyperscale data center development with land stewardship, ecological restoration, habitat connectivity, and community-oriented placemaking.

The Parties therefore intend that:

- The Project shall be designed and delivered in a manner that is physically and visually integrated with each individual parcel within the broader master landscape.
- Development shall respect and enhance the surrounding conservation lands and restored habitats.
- The Parties shall collaboratively evaluate the creation of a wildlife corridor connecting adjacent protected habitat patches across or adjacent to the Property.
- Adjacent mixed-use development (including potential residential and hospitality components) shall be conceptually aligned to ensure architectural and landscape harmony with the data center campus and vice versa.
- Building design, landscape architecture, and infrastructure planning shall emphasize rewilding, native restoration, water stewardship, and ecological continuity.

The Parties acknowledge that the integration of conservation, restoration, and infrastructure is a material component of the intended collaboration and shall be reflected in definitive agreements and the Project's governing documentation.

1

### 3. Property
Approximately 149 acres of powered land located across multiple parcels in Graniteville, South Carolina, including:
- 29-acre site including approx. 416,000 sq. ft. primary building and adjacent car park
- Top floor of restored office building (to be restored by Davis)
- 120-acre site adjacent building parcel to be set aside for conservation
- Associated grid connection rights, and power and natural gas allocation
- Applicable hydroelectric dams and turbines and related infrastructure to site (collectively, the "Property")

### 4. Proposed Transaction Structure
The Parties propose to form a newly created special purpose vehicle ("Project SPV") to develop, finance, construct, and operate a hyperscale AI data center project with an initial planned capacity of 100MW (the "Project").

### 5.1 Contribution Structure
- Davis shall contribute the Property at an agreed valuation of approximately $20,000,000, representing approximately ten percent (10%) of the initially contemplated equity capital for the Project, subject to adjustment based on final capital structure.
- ▨▨▨ (and/or its capital partners) shall arrange equity and project financing for the Project. In the event that Davis assists with the equity capital raise from his capital sources, then the Parties will agree to a finder's fee/commission for said equity capital invested into the SPV provided that any compensation for capital introductions shall comply with applicable securities laws.

### 5.2 Davis Equity Participation
- Davis shall not be required to contribute additional capital beyond the Property value unless voluntarily agreed.
- Davis's retained equity interest is intended to provide meaningful long-term participation in the upside value of the potential stabilized data center Project.

### 5.3 No Partnership Created
Except as expressly provided in Sections 14–17 (Legally Binding Provisions), these Heads of Terms are non-binding and do not create a legally binding partnership or joint venture until execution of definitive agreements.

### 6. Capital Structure (Indicative)
The Parties currently contemplate the following indicative capital structure for a 100MW stabilized project:

| Component | Approximate % | Approximate Amount |
|---|---|---|
| Senior Project Debt | ~70–80% | ~$800M–$1B |
| Equity Capital | ~20–30% | ~$250M–$400M |

Equity is expected to be provided by:
- Institutional capital partners
- ▨▨▨ sponsor capital
- Davis (via Property contribution equivalent to ~10% of total equity, subject to final valuation)

Final capital structure subject to lender, investor, and market conditions

"Financial Close" as used herein means the date on which the Project has secured binding equity commitments and executed definitive debt financing documentation sufficient to fund construction.

## 7. Security
Until Financial Close:
- Davis shall retain a first priority security interest in the Property which shall be released or subordinated to senior project financing at Financial Close.
- Security mechanism to be documented via deed of trust, mortgage, or equivalent instrument under South Carolina law.
- If Financial Close does not occur by the Long Stop Date, ▮▮▮▮ shall reconvey title to Davis.

## 8. Governance (Indicative Framework)
Definitive documentation shall provide for:
### 8.1 Board Composition
- Governance shall reflect equity ownership, subject to customary protections required by institutional investors and lenders.
- Davis shall be entitled to one board seat at Financial Close
### 8.2 Major Decisions (Supermajority Required)
- Additional indebtedness beyond approved business plan
- Sale of all or substantially all assets
- Change of business plan
- Capital calls
- Amendments to governing documents
### 8.3 Capital Calls & Dilution
- Equity contributions required pro rata.
- Davis shall not be required to contribute additional capital beyond the Property contribution unless voluntarily agreed. If Davis elects not to participate in additional capital raises beyond agreed commitments, dilution mechanics shall be defined in definitive agreements.

## 9. Distribution Principles
Distributions shall be made in accordance with a customary project finance waterfall structure, to be agreed in definitive agreements.

The Parties currently contemplate:
- Return of capital to Davis and other equity investors prior to profit distributions;
- A market-based preferred return to equity investors including Davis ($\approx$8%-10%); and
- Pro rata participation of equity holders thereafter, subject to any sponsor promote structure to be agreed upon by all Parties. It is intended that the waterfall structure will allow the ▮▮▮▮/Davis group as Sponsor to attain up to 50% project ownership subject to agreed promote structure.

Detailed waterfall mechanics shall be determined in definitive documentation.

## 10. Exit Strategy
The Parties currently anticipate one or more of:
- Stabilized asset sale
- Portfolio recapitalization
- Infrastructure fund exit
- REIT or institutional sale

**Target hold period: 3–7 years post-stabilization (indicative only).**
**Definitive agreements to include:**
- Drag-along rights
- Tag-along rights
- Transfer restrictions

3

- ROFR provisions

**11. Due Diligence**

Commencing on the signing of the Heads of Terms, ▮▮▮▮▮ shall have a sixty (60) day Due Diligence Period, with one thirty (30) day extension at ▮▮▮▮▮ option.

Davis shall provide access to:
- ALTA survey
- Title documentation
- Survey and legal description
- Planning and zoning documentation
- Grid connection agreements
- Power allocation confirmations
- Environmental reports (Phase I & II)
- Material contracts
- Tax records

▮▮▮▮▮ may terminate during Due Diligence in its sole discretion.

**12. Conditions to Financial Close**

Financial Close shall be conditional upon:
- Confirmation of minimum 100MW grid allocation
- Assignable and valid interconnection agreements
- Suitable zoning and planning approvals
- Satisfactory environmental and geotechnical reports
- Good and marketable title
- Finalization of definitive JV documentation
- Approval by investment committees and lenders
- No material adverse change

Financial Close shall be conditional upon confirmation that the Project has secured a firm and binding grid energization date on or before thirty-six (36) months from execution of definitive agreements.

**13. Long Stop Date**

The "Long Stop Date" shall be the later of:

(i) twenty-four (24) months from the execution of definitive agreements; or

(ii) twelve (12) months following the issuance of a firm and binding interconnection agreement (or equivalent grid allocation confirmation) from the applicable utility provider confirming a minimum committed capacity of 100MW together with a scheduled energization date.

If Financial Close has not occurred by the Long Stop Date, either Party may terminate the transaction upon written notice, provided that:

(a) the terminating Party is not in material breach of the definitive agreements; and

(b) ▮▮▮▮▮ has used commercially reasonable efforts to secure project financing and satisfy the Conditions to Financial Close.

Upon termination pursuant to this Section, the Parties shall have no further obligations except for those provisions expressly stated to survive termination.

**14. Exclusivity (Legally Binding)**

From the date of these Heads of Terms until definitive documentation is signed, ▮▮▮▮▮ shall have exclusivity. This exclusivity shall automatically terminate sixty (60) days from execution of these Heads of Terms at the conclusion of due diligence unless definitive agreements are executed earlier.  During Exclusivity, Davis shall:
- Not solicit, negotiate, or enter into agreements with third parties regarding sale or joint venture of the Property

4

- Not provide confidential development information to third parties
- Cease existing negotiations

Exclusivity shall terminate if ▓▓▓ is not actively pursuing its due diligence in good faith.

## 15. Confidentiality (Legally Binding)
The existence and terms of these Heads of Terms shall remain confidential except to:
- Professional advisers
- Lenders
- Equity partners
- As required by law

Confidentiality obligation shall survive for two (2) years.

## 16. Dispute Resolution (Legally Binding)
Disputes shall be resolved as follows:
1. Good faith negotiation
2. Mediation administered by the American Arbitration Association (AAA)
3. Binding arbitration under AAA Commercial Rules

Venue: South Carolina
Single arbitrator
Costs allocated by arbitrator

## 17. Governing Law (Legally Binding)
These Heads of Terms shall be governed by the laws of the State of South Carolina.

## 18. Regenerative & Conservation Commitments
The Parties reaffirm their shared commitment to regenerative development, conservation stewardship, and long-term ecological value creation as outlined in Section 2 (Purpose and Integrated Vision).

Definitive agreements shall include appropriate provisions addressing:
- Davis's Capital Contribution of the property
- Conservation parcel protections
- Wildlife corridor planning and habitat connectivity
- ESG reporting and environmental performance metrics
- Sustainable design and land stewardship standards
- Coordination with adjacent mixed-use and restoration initiatives

## 19. Status
Except for Sections 14 through 17 (inclusive), these Heads of Terms are non-binding and subject to execution of definitive agreements.

No obligation to consummate the transaction shall arise unless and until definitive agreements are executed. Financial projections, return estimates, and capital assumptions are illustrative only and do not constitute guarantees.

**Signatures on the following page.**

5

**Agreed and Accepted**
**Pete Davis or assigns**

By: _____
Name:
Date:





By:
Nam
Title: CEO
**Date:**    March 13, 2026